March 19.
JUDGE CARR.
Henry Randolph, at the sale of the estate of Archibald Cary, became a purchaser of property to the amount of 1661. for which he gave his bond with Brett Randolph as surety. Henry Randolph died; his widow administered on his estate. After some years, Cary’s executor sued Brett Randolph on the bond, and obtained Judgment. Brett Randolph paid the money, and moved'against the administratrix for it. He recovered a Judgment. Bhe appealed to this Court, and the Judgment was affirmed. Brett Randolph then levied his execution on four slaves; when Catharine and Georgiana Randolph, daughters of Henry Randolph, filed a Bill of Injunction to stay the sale; stating, that some years before, a division of their father’s estate had taken place, with the assent of *the administratrix, on which the slaves taken in execution had been allotted to them, and had been held by them ever since, as their separate property; and therefore, were not liable to an execution against their father’s estate. The Chancellor refused the Injunction. This Court granted it.
The Defendant answered, stating, among other things, that as to the division spoken of, if any such had taken place, (which he did not admit) it ought not to obstruct his execution, as the property was liable for his debt; but, whether liable or not, Equity ought not to interfere, as the Plaintiffs had a complete remedy at Law.
A replication was taken to this answer; but, no evidence was adduced to establish the division of the estate. On motion, the Chancellor, on the 27th of June, 1826, dissolved the Injunction, but directed the order not to go out. Then follows this entry in the record: “Needham, 19th July, 1826: By the Chancellor. There is no ground’which I am able to discover for the interference of a Court of Equity. The case, as it seems to me, was most clearly mistaken, and, regarding the order for the Injunction as improvident, the dissolution of it at the last Term was correct, and a copy of the order for it may now go out.”
Prom this, it would seem, that the order of dissolution was given in Court, but its operation suspended by another order, till the case should be considered in the vacation following, and the mandate received, which should give effect to the whole. Had the Chancellor the power to act upon the case thus in vacation? That he cannot dissolve an Injunction in the Country, is clear. That must be done in Court. Yet, is not this order, made at Needham, in effect the dissolution? Is it not that, which gives life and animation to the order made in Court? Without it, the Court order was wholly inefficient; the Injunction, to every practical effect, not dissolved; no execution could issue; and I presume, no appeal from the order could be taken ; for it was still sub judice. Suppose, when the Chancellor came to examine the case, he had discovered *that the Court order was improvident; he had only to withhold his mandate from the Country, and every thing would remain in statu quo. I do not think the Chancellor has the power thus exercised.
Considering this last order as the one appealed from, it may' be asked, has this Court the power to grant appeals from such orders? I answer, this Court may grant appeals from the dissolution of Injunctions; and this order, (however irregular) has had this effect.
But ought we, on such a proceeding, to take up the case on its merits? If by doing so, we can settle the principles of it, and thereby prevent another appeal for that pulpóse, perhaps it may be best.
As the division of the property, and the separate holding by the Plaintiffs, formed the sole ground on which they could stand in Equity, and this was not admitted by the answer, I incline to think, that they ought to have been prepared with proof of it, to prevent a dissolution. But, as my brethren (I understand) are against me on this point, I will pass on to the next; that is, has Equity jurisdiction of the case? This, though a question of interest and importance, I shall discuss very briefly.
The general rule is, that where the remedy is complete at Law, Equity cannot interfere. But where, from the peculiar nature of the property in contest, and circumstances of the case, no verdict of a Jury can compensate the claimant, Equity will lend its aid to preserve the property, and give it in specie to the true owner. The question is, whether slaves, when claimed as owner, (not incumbrancer,) are, from their nature merely, such property? This precise question has not been decided by the Court. The earlier cases put it on the ground of specific execution ; where we know, every application is to the sound discretion of the Court; and upon the whole case made, the question is, whether the ends of justice will be better attained, by taking or declining jurisdiction. In the case of Allen v. Freeland, 3 Rand. 170, the Plaintiff could hardly be *called the owner; he had (as he pretended) bought the slaves at public sale; had never had them in possession ; had paid no money for them; set no particular value on them;,and was strongly suspected of fraud. In Bower v. Creigh, 3 Rand. 25, the Plaintiff was an incumbrancer merely. I readily agree that ‘ ‘ various causes may ex *661 ist to give slaves a value in the eyes oí the master, which no estimated damages could reach. The slave may have been raised by him, and may possess moral qualities, which, to his master, render him invaluable. He may have saved the life of the master, or some one of his family; and thus have gained a value beyond all price. When any case of this kind is addressed to a Court of Equity, it will interfere, upon the principle, that there is no complete remedy at Law,” (as in the cases cited in Bowyer v. Creigh ;) and far would I be from obstructing the course of Equity, in the humane office of preserving the slave to his master in such cases. But, to such cases, I would restrict the interference. We must all agree, that there are many cases, in which a slave has no peculiar value with his owner; some, among the large slaveholders, where he is not even personally known; or he may be vicious or worthless. To these, and other such cases, the principle of equitable interference surely would not apply. When, therefore, a party' asks the aid of Equity, to take a case from the course of the Common Law, and the Jury trial, (a tribunal peculiarly fitted for such cases,) ought he not to show forth in his bill, the facts and circumstances making such change of forum proper? Is there any hardship in this? Whether the slave has a peculiar value with his master, none can so well know as the master himself. He can speak from his own feelings, his own knowledge. The simple fact of asking the aid of Equity, will hardly be taken as proof, that he sets a peculiar value on the slave, by those who witness the thousands of applications to that tribunal, in cases wholly unfit and improper.
*My opinion then is, that to authorise a Court of Chancery to grant an Injunction stopping the sale of a slave under execution, the Plaintiff must claim as owner, and state some fact or circumstance, whether the pretium affectionis or any other, tending to show, that the verdict of a Jury in damages would not compensate him; and that the mere claim of him as his slave, without more, does not authorise the staying such sale under execution.
JUDGE GREEN.
Upon a motion to dissolve an Injunction upon bill and answer, the facts alleged in the bill, and not denied by the answer, should be taken to be true. They stand upon the affidavit of the Plaintiff, and are entitled to as much weight on the motion to dissolve, as upon the original motion for an Injunction. A declaration by the Defendant, that he does not know or admit any particular allegation of the bill to be true, is not a denial; although it is sufficient to put the Plaintiff to the proof of the fact, upon the hearing. In this case, the Defendant does not deny the material allegation, that the slaves, upon which his execution was levied, had been distributed amongst the distributees of his debtor; and it is perfectly clear, that if that be the fact, his execution could not be legally levied upon them; they not being of the goods and chattels of the intestate in the hands of his administratrix to be administered. But, I think it equally clear, that a Court of Equity should not interfere to prevent a creditor from seizing and selling, under his execution, any property which he may think liable to it; unless the property be of such a character, that the owner cannot be fully compensated by the verdict of a Jury, giving him what might be the fair market value of his property; and this can only be, where the property is of such a nature, that it may fairly be supposed to have a peculiar and additional value in the estimation of the owner, the pretium affectionis. The grounds of this opinion have *been so often discussed in this Court, and the principle so completely settled, that it is unnecessary now to state them at large. Whether slaves are, prima facie, a property of this peculiar character, has never been determined; and this case, I think, presents that single question for decision. Eully apprised of the inconveniences of a decision either way, I cannot help thinking, that slaves ought, prima facie, to be so considered. The3' have moral qualities, which make them, in some instances, peculiarly valuable to their owners: but which could not be the subject of enquiry in each particular case, without great inconvenience and uncertainty. And whatever may be their qualities, we know that attachments naturally and generally grow up between master and slave, which cannot be the subject of pecuniary estimate by a Jury. This prima facie presumption may, however, be repelled by circumstances. As, if the slaves were necessarily to be sold, (as in the case of their being pledged for the payment of debts,) and the question is between a creditor claiming under a specific lien, and one claiming under execution ; or, if they were in the hands of the owner as a subject of traffic; in such cases, the injury done to the owner by seizing and selling them, under an execution against another, would be precisely and accurately measured by their market value. He could have full and complete redress at Law ; and there would be no ground for the interposition of a Court of Equity, for the purpose of preserving to the owner the property in specie.
I concur in the opinion which has been given, as to the irregularity of dissolving the Injunction in Court, with a direction that the order should not go out, and making a new order in vacation. Upon this ground, I think the order dissolving the Injunction should be reversed, and the Injunction reinstated.
*JUDGE COALTER.
The bill states, that the father of the Plaintiffs, who are the Appellants herp, died about the year 1804, leaving a widow and several children: that in 1809, a division of the estate took place, and that several of the children have married and left the family; and that the Plaintiffs have been ever since in possession of their portion of the estate, until the execution in the' bill mentioned, was levied on certain slaves belonging to them, and thus in their possession. This bill is sworn to in March, 1826.
The answer of the Appellee (who is uncle to the Plaintiffs) does not deny the allega *662 tions of the bill, but says, that he does not admit them, and calls for proof; and consequently, if the Injunction was properly allowed, it ought not to have been dissolved, until reasonable time was given to produce the proof so called for. The answer was sworn to in May, 1826; but when it was filed, does not appear on this record. The Plaintiffs instanter replied to it'; and on the 27th of June, 1826, the Injunction was dissolved, but the order not to go out. It seems, however, from the record, that a subsequent order was made by the Chancellor, at Needham, his Country residence on the 19th of July, 1826. It is in these words: “By the Chancellor. There is no ground which I can discover for the interference of a Court of Equity. The case, as it seems to me, was most clearly mistaken ; and regarding the order for the Injunction as improvident, the dissolution of it, at the last Term, was correct, and the cop}? of the order for it may now go out.” The Injunction had not been awarded by the. Chancellor, but had been refused by him ; and on an appeal from that refusal, had been granted by the Judges of this Court.
As the Decree of dissolution was suspended by that part of it which directed the order not to go out, I incline to consider it as tantamount to a dissolution and subsequent reinstating the Injunction, and of course, beyond the power *of the Court, except in term time. I presume, therefore, that that Decree could not then have been appealed from, as the direction not to send out the order rendered it inoperative; and consequently, the Decree was not then injurious. And, besides, I presume the Chancellor retained the record, and took it with him, to Needham; so that no copy could have been furnished, until the confirming Decree, and the directions to issue the order, were returned to the Clerk’s office. Prom that time, the Decree of June became operative and injurious to the party. I am clearly of opinion, that there is no Law authorising the Chancellor to make such Decree and order in vacation, as that of the 19th of July, above mentioned; and I at first doubted, whether, considering that as the Decree appealed from, we had jurisdiction over a decree so pronounced. I understand my brethren fully to concur with me as to the want of power in the Chancellor; but, that they are also of opinion, in which I concur, that inasmuch as the Decree of June is now put into operation, however irregularly that may have been done, it is necessarily from that Decree that the appeal is taken; and that we have, therefore, jurisdiction.
The question then is, whether the Injunction was improvidently awarded by the Judges of this Court, or not? I understand it to have been the constant course of this Court for a series of years, with a few particular exceptions, that where, on an execution against A. the slaves of B. are taken, B. is entitled to an Injunction ; and is not forced to permit the execution to proceed; and resort to his legal remedy for damages. The reason given by the Judge who has preceded me, is a sufficient ground for this decision ; but, I think another might well be superadded to it. The master has not only his own pecuniary interest to consult, and his own affections and predilections to gratify, in all of which he will be aided by the Courts: but, he owes a duty to the slave, as well as the slave does to the master, and which he ought to perform ; the duty of protection from a violent seizure and sale, which may terminate in the destruction *of his happiness, and in breaking asunder all his family ties and connexions. I have known slaves who could not be sold for $20, and whose masters ought to consider themselves bound by ties of real gratitude to avert such a calamity from them, if able to do so, at the expense of hundreds. Surely, such considerations ought to receive the attention and countenance of the Courts.
I therefore think, that the injunction was properly awarded, and that the Decree is erroneous and must be reversed.
JUDGE CABELL.
This is thought to be a fit occasion for the Court to express an opinion on the subject of the interposition of a Court of Equity to prevent the sale of slaves taken in execution.
Slaves are rational beings, and, as such, have moral qualities, which are calculated to render them of peculiar value in the estimation of their masters. It may be laid down as a position almost universal, that the master, unless obliged to sell, would think himself poorly compensated for the loss of a slave, by the price which a Jury might fix upon him. Moreover, slaves are human beings; and therefore, I do not think that even their attachments, and feelings are to be disregarded. The inhumanity of wantonly invading these attachments and feelings, forms with me an additional argument in favor of the interference of a Court of Chancery.
I am of opinion, that it should be regarded as a general rule, that the Courts of Chancery are bound to interpose, wherever the slaves of one man are about to be sold to pay the debts of another. The exceptions, to this general rule, whatever they may be, are to be brought forward and established, in each particular case, by those who claim the benefit of them.
I think, therefore, that the Injunction was properly awarded; and that it was wrong to dissolve it, without allowing *the Plaintiff time to prove the facts stated in the bill.
Another question presents itself, on which it is deemed expedient that this Courx should express its opinion. The order dissolving the Injunction was regularly made and entered in term time; but that order was followed immediately by another, which directed that the order of dissolution should not “go out;’’ and as the Court rose without taking any further order on the subject, this last order was, in effect, a suspension of the order of dissolution. The removal of the suspension of a former order of the Court, is a judicial act, which can be regularly performed only in open Court, where the parties may be present, and may be heard ; or, where they may at least observe what is done affecting their interests. I concur in the opinion, that *663 the order made by the Chancellor was irregular.
The PRESIDENT.
I think the proceedings in this case, after the Injunction had been dissolved by the Court, cannot affect the right of the Plaintiff to appeal from the decree. I am of opinion, also, that it was premature to dissolve the Injunction, before an opportunity had been afforded to the Plaintiffs, after answer filed, to substantiate the allegation in their bill by proof, if they could, that the slaves in question were held by them as distributees, among others, of the estate of Henry Randolph, their father. As to the grounds on which relief ought to be afforded, in a case like this, I refer to my opinion in the case of Freeland v. Allen, 3 Rand. 170.
I think the Decree ought to be reversed, and the Injunction reinstated.